UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SHON P. SHAW                          CIVIL ACTION NO. 10-cv-0132

VERSUS                                JUDGE HICKS

WARDEN, LOUISIANA STATE               MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

Shon Shaw ("Petitioner") was accused of forcing his mother into her car, which he then used to run off the road a car in which his former girlfriend was a passenger. Petitioner then struck the former girlfriend with a limb, grabbed her, and forced her to go into nearby woods with him. She eventually convinced Petitioner to let her go, and Petitioner was soon arrested. A Caddo Parish jury convicted him of attempted manslaughter and two counts each of second degree kidnapping and aggravated criminal damage to property. He was adjudicated a third-felony offender and sentenced to 40 years for attempted manslaughter, 80 years without benefits for the second degree kidnappings, and 30 years on the aggravated criminal damage to property counts, with the sentences to run concurrently.

The state appellate court affirmed the convictions and sentences on direct appeal. State v. Shaw, 939 So.2d 519 (La. App. 2d Cir. 2006). The Supreme Court of Louisiana granted certiorari to consider some of the issues raised and issued an opinion that again affirmed the convictions and sentences. State v. Shaw, 969 So.2d 1233 (La. 2007). Petitioner filed a post-conviction application and raised additional issues. He now presents

a petition for federal habeas corpus relief.  For the reasons that follow, it is recommended the petition be denied.

**Relevant Facts**

Petitioner and Karen Harris were in a romantic relationship for about 10 months, but they broke up in the summer of 2004.  About two weeks after the separation, Petitioner picked up Karen from her job at Church's Chicken on Mansfield Road in Shreveport and drove her to the IHOP on Pines Road where she was meeting several girlfriends for a birthday gathering.  Petitioner and Karen talked during the drive about the possibility of getting back together.

One of the women at the IHOP gathering was Sheryl Jeter, Petitioner's sister. Petitioner called Sheryl's cell phone multiple times during the dinner and asked to speak to Karen, whom he would ask what time she would be ready to spend time with him.  Karen could tell from Petitioner's voice that he was growing angry during the later calls, and the women eventually stopped taking the calls.  Petitioner then arrived at the IHOP and asked Karen to leave with him.  She went outside to speak to him, but he was yelling and acting strangely, so she went to the bathroom and would not come out.  The other girls were also nervous and gathered in the bathroom.  The police were called, and Petitioner left.

Ms. Jessica Jeter, the mother of Sheryl and Petitioner, testified that Petitioner came to her house, upset, and demanding that she call Karen, Sheryl, and the other women because he needed to talk to them.  She at first ignored him and walked back to her bedroom but then noticed Petitioner was "really kind of serious," so she called Sheryl on her cell phone and

asked her to bring Karen home because Petitioner did not want Karen to be with the other women.  Ms. Jeter said that, as she was speaking on the phone, Petitioner took the phone and told Sheryl to put Karen on the line.  He then said that Ms. Jeter wanted the women to come to her house.  Ms. Jeter looked at her son and said, "No, Shon, you said that.  Ms. Jeter didn't say anything."  Petitioner told his mother that she needed to stay out of his f---ing business. "And he took the phone and started beating me upside my head."  Ms. Jeter tried to get away but he "kept beating me until the phone fell apart."  "Then he got up in the bed and started beating me with his fists ... until I guess he got tired, and then he just stopped and said, let's go."  Petitioner made Ms. Jeter call the women again to let them know it was urgent that they all come to her home. Sheryl testified that she received a call on her cell phone from Ms. Jeter, who was screaming and asking Sheryl to please come to her house.

Ms. Jeter was bleeding from her head, and she was wearing only a gown.  She asked to put on some clothes before leaving with Petitioner, and he followed her "in my every footstep" as she got dressed.  They went to the two-car garage where Ms. Jeter's Lincoln Town Car was parked, and Petitioner told her to get in the car.  She did, but she tried to get out when Petitioner walked to the driver's side, but he ordered her to get back in and asked, "Do you think I'm playing with you?"  She got back in the car, Petitioner closed the door, then he got in the car and opened the garage.

Sheryl and one of the other women had just arrived and parked Sheryl's Lexus in the driveway behind the Lincoln.  Ms. Jeter saw Sheryl's car behind them and cautioned Petitioner not to hit it.  Petitioner turned off the ignition of the Lincoln, got out and headed

toward the women as Ms. Jeter begged him to get back in the car.  Petitioner reached for Sheryl, and Ms. Jeter heard both women in her car scream.  About that time, Karen and two other women arrived in a Nissan Altima and parked on the street but across the driveway. Petitioner started toward that car, where Karen was in the back seat.  He and Karen exchanged words, but Karen refused to get out of the car and said the police had been called. When she said that, Petitioner turned around and said, "Let's go, mama."  He ordered Ms. Jeter in the Lincoln, pushed her inside, and slammed the door.  He managed to back around Sheryl's car and get to the street.

The Altima, containing Karen and two other women, left, and Petitioner followed. Ms. Jeter testified that Petitioner was "driving too fast" and she asked him to slow down.  He instead kept accelerating.  Ms. Jeter said: "Once we went around the curve and headlights hit the back of Danielle's car, I knew we were not going to stop.  I just said to myself, oh Lord he's going to hit them; and that's what he did."  Both cars then went off the road and hit trees.  Detective Tom Oster testified that the Lincoln was resting against a pine tree and the "whole front end was caved in."  The Altima had heavy front end damage from hitting a pine tree, and the "back end of the car was pushed all the way up to the backseat area of the car."  The trunk was open, and the rear glass was broken out.  The car was "accordioned," and the detective was unable to open its doors.  Both cars were totaled.

Ms. Jeter testified that she reached for the door handle to get out, and her next memory is waking up on the ground being treated by a first responder. She suffered head

trauma and a broken pelvis, spent time in a wheelchair, and was walking only with the aid of a cane at the time of trial one year later.

The three women in the Altima were unable to open the doors, so they crawled out the rear passenger window.  One of them recalled Petitioner walking calming towards them, but another said that he ran toward them.  Two of the women ran away, but Karen, who was trying to get to the nearby home of a policeman she knew, kept falling.  Petitioner came upon her "real fast" and "started swinging on me."  He hit her in the back with a tree branch and accused her of not loving him.  She said she did and, because she was so scared, agreed to go with him.

Petitioner grabbed Karen's arm and pulled her into nearby woods as they heard police coming.  She soon heard the police calling her name and the barking of dogs.  She persuaded Petitioner to take off his shirt and leave it, and she pressed her bare feet deep in the mud, all in efforts to help police track her.  Karen kept falling down, and Petitioner kept ordering her to get up.  When they were near First Assembly of God Church on West 70th Street Karen convinced Petitioner to give her 50 cents and let her go to a nearby Diamond Shamrock station where she promised to use a pay phone call him a ride.  She instead called police and was rescued.  Karen testified that she had two broken bones in her neck, bruising on her arms, cuts on her feet, a blood clot on her calf, and a bruised thigh that made it difficult for her to stand. It took her several weeks to recover.

An arrest warrant issued  for Petitioner, and he turned himself in and gave a recorded statement.  The statement was played for the jury but not transcribed by the court reporter

(Tr. 356-57), and it does not appear a transcript of the statement is elsewhere included in the record filed with this court.  The state appellate court summarized Petitioner's statement in its opinion, and Petitioner has not disagreed with the description.  The court said that Petitioner told police he was not mad at Karen, did not call her multiple times at IHOP, and that the women were leaving his mother's house to go eat at What-A-Burger when he lost control of his mother's car on a wet road and accidentally rear ended the Altima.  He denied dragging Karen into the woods or harming her in any way, and he said he left the scene because he panicked.  He denied forcing his mother into the Lincoln and insisted she was unconscious the whole time.

## Sufficiency of the Evidence

### A.  Exhaustion

Petitioner argued on direct appeal that the evidence was insufficient to sustain his convictions and that the trial court should have granted his motion for post-verdict judgment of acquittal or a new trial.  He argued the State did not prove beyond a reasonable doubt that he had the specific intent to kill Karen or that he intentionally damaged the two cars.  The state appellate court addressed the claims on the merits.  The Supreme Court of Louisiana noted that Petitioner's writ application included a claim the evidence was insufficient, but in his brief after the grant of writs Petitioner did not raise, brief, or argue any assignments of error other than those addressing his multiple offender enhancement and the alleged abridgement of his right to testify.  The Supreme Court deemed the other issues abandoned

for lack of briefing.  Shaw, 969 So.2d at 1238 n.3.  Petitioner did not raise a claim of insufficient evidence in his post-conviction application.

An application for a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  The requirement is satisfied if the federal issue has "once been properly presented to the highest court of the state" either on direct appeal or through a post-conviction application.  Sones v. Hargett, 61 F.3d 410, 415 (5th Cir. 1995).  Petitioner did not properly present his sufficiency of the evidence issues to the Supreme Court of Louisiana. Rather, he abandoned them by not briefing them on the merits when the opportunity was afforded.  Habeas relief is, therefore, not available with respect to these claims.

## B.  The Merits

Petitioner's sufficiency claims, even if they had been exhausted, are plainly lacking in merit. In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). "[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined

Page 7 of  21

by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012).

Aggravated criminal damage to property includes intentionally damaging any movable when it is foreseeable that human life might be endangered. La. R.S. 14:55. Ms. Jeter, who was in the car with Petitioner, testified that Petitioner accelerated until he slammed into the Altima with enough force that both cars were totaled and some of the occupants were seriously injured. Marvette Jones, one of the passengers in the Altima, testified that there was at first a big gap between the cars. Even though the Altima was speeding up, she soon saw the lights of Petitioner's car close the gap just before it slammed into the Altima. The state appellate court held that a rational jury could find from this testimony, plus crime scene photos, that the collision was no mere accident and that the lives of Karen and Ms. Jeter would be endangered. State v. Shaw, 939 So.2d at 524.

Second degree kidnapping includes when the defendant forcibly seizes and carries a person from one place to another, and the victim was physically injured. La. R.S. 14:44.1. Ms. Jeter testified that Petitioner beat her repeatedly with his fists and a telephone and forced her against her will into the car. Other witnesses supported her testimony. Ms. Jeter also suffered a broken pelvis. Karen, supported by testimony of other witnesses, testified that

Petitioner hit her with a limb, grabbed her by the arm and forced her to accompany him into the woods.  A state appellate court found that this evidence was sufficient to allow a jury to return a verdict of guilty of two counts of second degree kidnapping.  State v. Shaw, 939 So.2d at 524.

Manslaughter is a homicide that would be first or second degree murder but is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  La. R.S. 14:31;  jury instructions at Tr. 396-97.  The state appellate court explained that attempted manslaughter requires proof of specific intent to kill the victim and commission of an overt act in furtherance of that goal.  It found sufficient evidence of that intent from the fact that Karen was a backseat passenger in the car that Petitioner rammed from behind with enough force that it pushed the rear bumper of the Altima almost into the backseat and caused extensive other damage to both cars.  State v. Shaw, 939 So.2d at 523-24.

Petitioner argues that the evidence does not show that the incident was anything other than an automobile accident, and he contends there is "no evidence" that he kidnapped his mother or Karen.  The record demonstrates overwhelmingly that Petitioner's arguments are preposterous.  One might mange to make a reasonable closing argument for acquittal on a count or two, but it certainly cannot be said that the state appellate court's reasoned post-verdict application of Jackson to these facts was not only wrong but so incorrect as to be an objectively unreasonable application of Jackson.  Habeas relief is not available on these claims.

**Illegal Sentences**

Petitioner was convicted of five felony offenses based on his actions on June 26, 2004. He was adjudicated a third-felony offender based on two prior convictions: possession of drugs and unauthorized use of a movable.  The sentences on all five of his new convictions were enhanced under Louisiana's habitual offender statutes.

Petitioner argued on appeal that State ex rel Porter v. Butler, 573 So.2d 1106 (La. 1991) prohibited habitual offender enhancement of more than one conviction obtained on the same date arising out of a single criminal episode.  The Supreme Court of Louisiana granted certiorari and reviewed this claim on the merits.  The analysis was based on an interpretation of Louisiana jurisprudence and habitual offender legislation.  The Court ultimately overruled Porter and affirmed the enhancement of all five sentences.  State v. Shaw, 969 So.2d 1233 (La. 2007).

Petitioner's habeas petition continues his argument that the Louisiana statute should be interpreted as in Porter.  Petitioner's argument is based entirely on how state law should have been interpreted, but the habeas statute provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).  Habeas relief is not available even if Petitioner is correct on this state law issue.

**Right to Testify**

Petitioner argues that Judge Scott Crichton, who was the trial judge, erred in asking whether Petitioner would testify.  He joins this with an argument that defense counsel Mary Harried frustrated his right to testify after he made known his desire to take the stand.  The following colloquy occurred after the State called its last witness:

> THE COURT: For the record the jury is outside the courtroom. I think Mr. Hall is about ready to rest. Ms. Harried, I need to—so I don't have to run the jury back outside the courtroom, I need to know whether or not your client intends to take the witness stand. And if not, I need his statement for the record as to the fact that he chooses not to testify.

> MS. HARRIED: Your Honor, I have had an opportunity to speak with Mr. Shaw. I have told him that it is my advice that he not take the stand. I have explained what dangers he faces if he takes the stand. I've explained to him that his entire criminal history would come out in front of the jury. In fact, I would have to ask him prior to Mr. Hall cross-examining him so that it did not look like we were hiding anything from the jury.

> I explained to him the dangers that he would face on cross-examination and how I thought that that may impact the jury. He agreed with my assessment, and he agreed that he did not wish to testify.

> THE COURT: Mr. Shaw, is that correct?

> MR. SHAW: Yes, sir.

> THE COURT: Your lawyer has explained the advantages and disadvantages of testifying verus [versus] not testifying. And my understanding is that your choice is that you not testify.

> MR. SHAW: Yes, sir.

The Supreme Court of Louisiana stated that the trial court did not have a duty to inquire about whether Petitioner would testify, but that did not mean the court lacked

discretion to conduct an on-the-record waiver outside the presence of the jury so long as the court did not interject itself into the strategic decision made by the accused with advice from counsel.  The Court's review of the exchange found no evidence of improper influence and "simply no evidence" that Petitioner's right to testify was violated or that the trial judge impermissibly discouraged Petitioner from testifying.  State v. Shaw, 969 So.2d at 1246-47.

Petitioner admits in his memorandum at footnote 1 that the courts are not in agreement on whether such a colloquy from the trial court is advisable.  The majority of jurisdictions impose no duty to make such an inquiry, other courts say that the inquiry is not mandatory but is desirable, and a few jurisdictions impose an affirmative duty on the trial court to inquire.  See Michele C. Kaminski, Requirement That Court Advise Accused of, and Make Inquiry With Respect to, Waiver of Right to Testify, 72 ALR 5th 403 (1999).  Some fear that the court, by making inquiry, could influence the defendant to testify when perhaps he should not, and could intrude upon the attorney-client relationship.  Such inquiries, however, often have the desirable effect of precluding unnecessary evidentiary hearings; prisoners in cases where there was no inquiry often claim in post-conviction that counsel did not allow him to testify.

Habeas relief may not be granted on this claim unless the state court's adjudication of the issue resulted in a decision that was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Not even circuit court precedent can constitute clearly established law under the statute.  Parker v. Matthews, 132 S.Ct. 2148, 2155-56 (2012).  Petitioner has

not pointed to any Supreme Court decision that clearly prohibits a trial court from making the kind of neutral inquiry described above.

Petitioner makes a related assertion that defense counsel frustrated his right to testify. He included this argument in his pro se submissions that were filed during the direct appeal process. See, e.g., Tr. 537, 548-51.  It is not clear whether Petitioner properly exhausted the claim, but it may be denied on the merits even if not exhausted. Section 2254(b)(2). Petitioner points to no evidence to support the merits of this claim other than the colloquy set forth above.  There is nothing in that exchange that suggests counsel acted improperly. The right to testify may have belonged to Petitioner, but counsel could and should have advised him of any dangers he might face if he took the stand.  Explaining such dangers is not an improper influence on the right to testify.

**Sentencing as Habitual Offender**

Petitioner argues the trial judge did not state for the record the prior conviction(s) used to enhance his current sentences under the habitual offender law.  The prosecution introduced S-1 and S-2 into evidence at the habitual offender hearing.  The exhibits were described as copies of bills of information and certified minutes from certain case numbers from Caddo Parish.  A fingerprint expert compared Petitioner's fingerprints to those in the prior cases and persuaded the judge that Petitioner was a third-felony offender as charged.  Tr. 437-40.

It does not appear that the prosecutor or judge stated on the record of the habitual offender hearing the nature of the two predicate convictions, but that would have been apparent from the exhibits (which do not appear to have been filed in this court). The trial

judge did state on the record at sentencing that the first predicate felony was a 1994 conviction for possession of a controlled dangerous substance Schedule II, and the second was a 1998 conviction for unauthorized use of a movable. Tr. 5. Accordingly, this argument is without factual basis. It is also based on an argument that there was a mistake of state law, for which federal habeas relief is not available.

**Designation of Place of Confinement**

At the conclusion of the sentencing hearing, the trial judge stated that Petitioner was "remanded to the deputy sheriff for transfer to Department of Corrections Angola." Tr. 460. Petitioner argued in a pro se appellate brief that Louisiana law required the judge to sentence him to the custody of the Department of Public Safety and Corrections and prohibited him from designating a particular place of confinement. Tr. 518-20. The Supreme Court of Louisiana stated that this issue was abandoned when it was not properly briefed after writs were granted. State v. Shaw, 969 So.2d 1233, n.3. The issue was not, therefore, properly exhausted. It is also based wholly on an alleged error of state law rather than federal constitutional law, so habeas relief is not available.

**Ineffective Assistance of Counsel**

**A. Introduction; AEDPA Standard of Review**

Petitioner makes several arguments that his trial counsel was ineffective. To prevail on such a claim, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there

is a reasonable probability that the result in his case would have been different.  <u>Strickland</u> <u>v. Washington</u>, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. <u>Schriro v.</u> <u>Landrigan</u>, 127 S.Ct. 1933, 1939 ( 2007). The <u>Strickland</u> standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." <u>Knowles v. Mirzayance</u>,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  <u>Harrington</u> <u>v. Richter</u>, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  <u>Id</u>.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  <u>Id</u>.

### B.  No Objection to Lack of Notice

Louisiana Code of Criminal Procedure Art. 768 provides that, unless the defendant has been granted pretrial discovery, if the State intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the opening statement.  If the State fails to do so, the statement is not admissible.

Petitioner argues that his counsel was ineffective because she did not object to the State's introduction of his recorded statement on the grounds that proper notice was not given.

Petitioner raised this argument in his post-conviction application.  The State responded with an affidavit from trial counsel in which she testified that she was afforded "open file discovery" and played Petitioner's recorded statement for him on January 26, 2005 (six months before the trial began on July 26, 2005) and told him that the statement would be used at trial.  She recounted that the State did file a notice pursuant to Art. 768, though Petitioner contends that it is too general in nature, and a free and voluntary hearing was held prior to opening statements to explore the admissibility of the statement.  Counsel states that she informed Petitioner approximately six months before the trial that his statement would be used at trial, so she felt no obligation to object to a lack of proper notice.  Tr. 1034.

The trial court looked to this evidence and found this claim to be unfounded.  Tr. 914. The state appellate court issued a one-paragraph opinion that did not discuss the several specific issues raised in the post-conviction application but generally concluded that Petitioner "failed to prove that his court-appointed defense counsel committed unprofessional errors or that, but for counsel's alleged unprofessional errors, there is a reasonable probability the outcome of the trial would have been different."  Tr. 1052.  The Supreme Court of Louisiana denied writs without comment.  Tr. 1219.  The state court's decision was perfectly reasonable based on the record, so relief is not available on this claim.

### C.  No Circumstantial Evidence Jury Instruction

Petitioner argues that his counsel was ineffective because she did not request a jury instruction regarding consideration of circumstantial evidence.  Defense counsel testified in her affidavit filed in the state court that circumstantial evidence was not an issue in the case. The several witnesses testified to what they saw and heard at the scene of the crimes.  Tr. 1034.  The trial court found, accordingly, that this claim was without merit.  Tr. 914-15. Petitioner has yet to articulate how the circumstantial evidence charge could have affected the verdict.   The trial record does not indicate that circumstantial evidence had any significant role in this case.  Relief is not available on this claim.

### D.  Cross-Examination of Karen Harris

Karen Harris gave testimony that was quite helpful to the State's case.  Defense counsel cross-examined her on points such as establishing who was in what car, the positions of the cars, that Petitioner and Karen had spent time together shortly before the incident, and that none of the women called 911 as they drove to Ms. Jeter's house.  Tr. 291-97.  Petitioner claims that defense counsel should have further examined Karen based on what Petitioner considers discrepancies between her testimony and police reports.

For example, Karen testified that the policemen at the IHOP did not go with Sheryl when she left to check on her mother.  Tr. 278.  Petitioner points to a police report that states that Sheryl asked the officers to follow as she left the IHOP.  Petitioner sees this as an inconsistency, but a look at the record shows that it is not. Karen Harris testified: "The police was out there still.  She (Sheryl) said,  could you please help me?  Could you please help

me?"  Karen then said the police did not go with Sheryl despite that request. Sheryl asked, but the police did not go; there is no inconsistency.

Petitioner also complains that defense counsel did not cross-examine Karen about the fact that her direct testimony did not include the statements a police report said she made about Petitioner causing a big scene at the IHOP and saying he would kill Karen and Sheryl. Defense counsel was wise to avoid any evidence that Petitioner said he would kill Karen when a key issue was whether he had specific intent to kill.  Had defense counsel drawn the jury's attention to this evidence, when the State did not mention it, Petitioner would surely be claiming that counsel was incompetent for having done so.  Petitioner also points to Karen's testimony that he gave her 50 cents to call him a ride, while the police report does not mention Petitioner giving Karen any money.  This is typical of the other trivial perceived inconsistencies that Petitioner argues counsel should have developed.

Trial counsel testified in her affidavit filed in state court that she asked the questions that she believed to be appropriate and found no inconsistent statements by Karen about the facts of the case.  Regarding the 50 cents, she said it had nothing to do with guilt or innocence.  The trial court found that the record was void of any evidence to suggest that counsel provided less than an appropriate cross-examination of Karen.  Tr. 915.  That was a reasonable resolution of the Strickland claim given the trivial or non-existent inconsistencies suggested by Petitioner.  It certainly was not the kind of extreme malfunction for which habeas relief is permitted.

### E.  Conflict

Petitioner filed about four months before trial a motion to appoint new counsel (Tr. 162) in which he complained generally that counsel had not conducted adequate research or investigation to build a solid defense, had not received complete discovery, did not completely focus on and consult with Petitioner frequently, did not provide progress developments, and did not focus on a bond reduction.  The trial court did not rule on the motion, and counsel conducted the trial without any indication in the record of problems in this regard.

Petitioner argued in his post-conviction application, and present here in his Amended Petition (Doc. 14), that counsel was ineffective because his pro se motion showed there was a conflict between counsel and client.  Counsel testified in her affidavit that she did not have a conflict with Petitioner and was not indifferent as to how the case should be resolved.  She reviewed the file, had a good command of the facts, investigated the weather conditions on the date of the incidents, and had an investigator interview Ms. Jeter.  She discussed with Petitioner her request for Karen's medical records, which she reviewed.  She gave Petitioner a copy of discovery as he requested, and she went over the discovery with him, initially on September 1, 2004.  Counsel kept Petitioner informed of the progress of this case through personal visits and phone calls.  Tr. 1035.

The trial court looked to counsel's testimony and added that counsel had filed numerous motions on Petitioner's behalf, including a motion for bond reduction.  The Strickland claim was rejected.  That was an entirely reasonable resolution of this claim based

on the general assertion of dissatisfaction by Petitioner countered by specific testimony from defense counsel.

**F.  Cumulative Error**

Petitioner's final argument is that the cumulative effect of the errors he argues denied him a fundamentally fair trial.  Federal habeas corpus relief may only be granted for cumulative errors  in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process. Martinez Perez v. Dretke, 172 Fed. Appx. 76 (5th Cir. 2006), citing  Derden v. McNeel, 978 F.2d 1453, 1457 (5th Cir.1992) (en banc).

Petitioner has not shown that constitutional errors infected his trial such that his due process rights were violated.  None of the arguments he has presented have merit, so the state court's denial of this claim was not contrary to clearly established Supreme Court precedent.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be **denied**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an

extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 1st day of July, 2013.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE